

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00206-CR

_____

TYRONE LEARONE MCCURDY, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 27,412

_____

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Among the strategies used by Tyrone Learone McCurdy in his attempt to defeat the charge that he murdered Treybbian Leekey Nelson by shooting Nelson with a firearm as Nelson ran away, McCurdy claimed self-defense and testified to facts that, if believed by the jury, would establish that defense. From McCurdy's conviction, his enhanced sentence of fifty years' imprisonment, and the trial court assessment of $16,450.00 in attorney's fees against him, this appeal was taken. Here, McCurdy argues that the evidence was insufficient to support the jury's rejection of his self-defense claim. McCurdy also asserts that the trial court erred in ordering him to pay attorney's fees absent a finding that he had the ability to pay them. While (1) the evidence sufficiently supports McCurdy's conviction, (2) the award of attorney's fees must be reversed.

*(1)* *The Evidence Sufficiently Supports McCurdy's Conviction*

When apparently long-standing animosity between McCurdy and Nelson came to a head, Nelson died after being shot by McCurdy.

Adrian Davis, Nelson's cousin, testified that he was walking with Nelson on the day of the shooting when he saw McCurdy drive by in a "pearl white Cadillac," staring "at me and [Nelson], just like he wanted to do something to [Nelson]." Davis and Nelson continued walking to Ronnie Baylor's house on Edgar Street, and sat on the porch and talked, including some interchange with Brandon Aaron Jones and Teresha Barrett.

Bernard Kelly testified that McCurdy wanted to retrieve two assault rifles that Kelly had in his possession. Kelly went with McCurdy and Shaun Perkins in McCurdy's white Cadillac to

2

retrieve the guns. After getting the guns, McCurdy "flip[ped] out," directing Kelly to drive the car toward Edgar Street so "no one'd get hurt." During the drive, McCurdy kept the guns "between his legs in the front seat."

Barrett had just returned to her grandmother's house at 1003 Edgar Street when she noticed Nelson and engaged him in small talk. Barrett also noticed "a white Cadillac coming with all the windows down" "going slow" with "three people in the car." Barrett knew McCurdy as "a friend of the family" and concluded that the vehicle belonged to him. Barrett testified that McCurdy was in the front passenger seat, Kelly was driving, and the juvenile, Perkins, was in the back seat.

Barrett testified "[Nelson] stuck up the middle finger to the car . . . and he said, f*** you." The car slowed and stopped. Nelson, "obviously" thinking a fight was imminent, walked toward the street, dropping his bag in the middle of the yard, stepping into the street, and throwing his hands up. Jones and Kelly also testified that Nelson cussed at McCurdy and ran into the street.

According to Barrett, "the passenger's door had opened. And as [McCurdy] was getting out, we heard a big old boom." [1] Nelson ran back into the yard, and McCurdy got out of the car.[2] McCurdy "held up the gun and then he hollered – [Nelson] ran to the fence -- to the end of the fence, and then [McCurdy] hollered, don't run or run motherf***er or something like that. And that's when [McCurdy] just started shooting." Kelly testified that Nelson ran between two

---

[1]Kelly testified that, after Nelson dropped his backpack and came onto the street, McCurdy "jump[ed] out of the car and fired off."

[2]Jones testified Nelson continued running toward the car.

3

houses, jumped a fence, and continued running. After McCurdy fired several rounds, he "jump[ed] back in the car" and told Kelly to drive off.

Genola Brown resided on Clark Street, one street over from Edgar Street. Brown was watching television inside of his home when he heard the gunshots. He waited a while for quiet and opened the door. Brown saw a young man, Nelson, running. Nelson fell, got up, and fell again across the street from Brown's house. Brown and his brother went to check on Nelson, were told by Nelson that he had been shot, and called 9-1-1.

Officer Richard Greer arrived on the scene to find Nelson in "an extreme state of pain; shock." Nelson was transported to the hospital where he died after life-saving efforts failed. Jeffrey Barnard, the chief medical examiner of Dallas County who performed Nelson's autopsy, testified that death was caused by a "gunshot wound that was located on the right lateral chest." Barnard determined that the bullet entered through the "right lateral chest," "exit[ed] the left midchest," and "went slightly from back to front."

McCurdy fled to Dallas after the shooting because he "didn't want to go to no jail." He eventually returned to Greenville where he was apprehended. Officers were later told that a "BB gun" was found by Davis inside Nelson's backpack.

At trial, McCurdy explained the reason for animosity he shared with Nelson. He testified that Perkins, in 2010, called and informed him that Nelson was "over here f***ing with me." McCurdy gathered a friend, Devon Royal, and drove to Perkins' aid. McCurdy testified that, on that occasion, he hit 21-year-old Nelson in the face for mistreating the then 14-year-old Perkins.

4

McCurdy testified that he and Nelson engaged in a fist fight. McCurdy, Devon, and Perkins left the scene of the fight.

McCurdy testified to two subsequent encounters with Nelson, during which Nelson sought to engage McCurdy and acted to provoke him. McCurdy reportedly downplayed each situation. That pattern reportedly continued. During a later encounter in a Church's Chicken parking lot, McCurdy claimed that Nelson and another person appeared as if they were going to fight him. McCurdy pretended to have a gun, got into his car, "h[u]ng out the window" and warned Nelson to "stop running up on me or I'm gonna bust you in your ass."

On the day of the shooting, according to McCurdy, he saw Nelson and Davis walking towards him. McCurdy claimed that Nelson began to engage him, but "[t]his time he had his bag." After McCurdy drove off, he asked Kelly for his "SKS rifle" "because these dudes tripping." McCurdy clarified that he thought Nelson had a gun. After retrieving his guns, McCurdy went looking for Nelson and Davis, using Kelly as his driver. He found Nelson, and told Kelly to stop the vehicle with the intention of just getting "out with the SK" to scare him.

McCurdy first testified that Nelson "grabbed his bag" and ran into the street while "reaching in his bag." He later testified that Nelson came out toward the street, went back to get his backpack, and retrieved a pistol. During cross-examination, McCurdy admitted that he was the first person to display a weapon. McCurdy "fired the SK into the ground really to scare him." Because Nelson was still coming toward the street, McCurdy claimed, "I believe he was gonna come try and shoot me." McCurdy testified that Nelson "came around the car and pointed

5

a gun at me," causing McCurdy to react "and let off a couple of shots at him." McCurdy denied that he fired any shots at Nelson after he started running away.

McCurdy admitted to shooting Nelson, but claimed it was in self-defense. On raising self-defense, McCurdy bore the burden of producing some evidence that supported his claimed defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). This was accomplished through his testimony at trial. Once McCurdy testified, the burden then shifted to the State, which bore the burden of persuasion "to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594; *see Saxton*, 804 S.W.2d at 913–14. The burden of persuasion does not require the production of evidence, but it did require the State to persuade the jury beyond a reasonable doubt that McCurdy did not act in self-defense. *See Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008); *Zuliani*, 97 S.W.3d at 594. A jury verdict of guilt is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

In evaluating sufficiency of the evidence under the *Jackson* standard, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of murder beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (referring to *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Because the State carries the burden of persuasion to disprove self-defense beyond a reasonable doubt, we review a challenge to the sufficiency of the evidence supporting a jury's rejection of a claim of

self-defense under the *Jackson* standard.  *See Brooks*, 323 S.W.3d at 912; *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Miranda v. State*, 350 S.W.3d 141, 147 (Tex. App.—San Antonio 2011, no pet.).[3]  We examine legal sufficiency under the direction of the *Brooks* opinion while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Self-defense justifies the use of deadly force if certain circumstances are met.  *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011).  Under the Texas Penal Code, the use of deadly force is justified

> (1)   if the actor would be justified in using force against the other under Section 9.31; and
>
> (2)   when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>
> > (A)   to protect the actor against the other's use or attempted use of unlawful deadly force . . . .

TEX. PENAL CODE ANN. § 9.32(a) (West 2011).  The use of force is justified under Section 9.31 "when and to the degree the actor reasonably believes the force is immediately necessary to

---

[3]In *Brooks*, Judge Cochran's concurrence suggested that a factual sufficiency review is still appropriate where the defendant had the burden of proof on an affirmative defense.  *Brooks*, 323 S.W.3d at 924 n. 67 (Cochran, J., concurring); *see Matlock v. State*, 392 S.W.3d 662, 673 (Tex. Crim. App. 2013); *Lantrip v. State*, 336 S.W.3d 343, 346 n.5 (Tex. App.—Texarkana, 2011, no pet.).  But here, where the State ultimately must persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense, the *Jackson* standard is the appropriate standard of review.

7

protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE

ANN. § 9.31(a) (West 2011).

However,

[t]he actor's belief . . . that the deadly force was immediately necessary . . . is presumed to be reasonable if the actor: . . . (2) did not provoke the person against whom the force was used; and . . . (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor . . . at the time the force was used.

TEX. PENAL CODE ANN. §  9.32(b)(2), (3) (West 2011).

The story told by McCurdy at trial differed greatly from the one told by the remainder of the witnesses.  Davis, Barrett, and Kelly testified that Nelson was unarmed, had dropped the backpack before coming onto the street, and did not retrieve anything from the backpack.  Davis and Barrett also testified that McCurdy instructed Nelson not to run and that Nelson was shot after "[h]e started running."  Detective Mike Johnston inspected the scene of the shooting and "noticed where part of the chain link fence looked hit by a bullet," indicating that McCurdy continued to shoot at Nelson even after he was running away.  The trajectory of the bullet "went slightly from back to front."  Officer Jamie Fuller testified that, when he interviewed McCurdy, he denied involvement, but, in the second interview, he claimed that Nelson had a gun and that he shot in self-defense.

The jury could have disbelieved McCurdy's testimony that Nelson had attempted to provoke him several times, or that McCurdy, who was eight years older than Nelson, was actually afraid of Nelson.  However, they could have believed McCurdy's testimony which established that he went looking for Nelson after retrieving a gun so that he could be armed when confronting Nelson.  The fact that McCurdy was riding in the passenger seat of his own car could

8

have indicated his intent to prepare for armed conflict, and his failure to drive away after finding Nelson indicated his intent to initiate the conflict. From the testimony at trial, including McCurdy's previous threat to Nelson, the jury could have concluded that McCurdy provoked Nelson.

Also, McCurdy testified that he had previously been convicted of several felonies and was prohibited from possessing a firearm, but that he "had two firearms" in violation of the law. TEX. PENAL CODE ANN. § 46.04 (West 2011). Thus, since McCurdy was otherwise engaged in criminal activity, the jury could have found unreasonable McCurdy's claim that he believed that the deadly force was immediately necessary.

The evidence was legally sufficient to support the jury's finding beyond a reasonable doubt that McCurdy did not act in self-defense.

*(2)    The Award of Attorney's Fees Must Be Reversed*

After an affidavit of indigence portrayed McCurdy as unemployed and without assets, the trial court found him to be indigent and appointed counsel to represent him during trial. "A defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010) (quoting TEX. CODE CRIM. PROC. ANN. art. 26.04(p) (West Supp. 2012)).

A claim of insufficient evidence to support court costs is reviewable on direct appeal. *Mayer*, 309 S.W.3d at 556. Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of court-appointed attorney's fees.

9

> If the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the defendant to pay during the pendency of the charges or, if convicted, as court costs the amount that it finds the defendant is able to pay.

TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2012). "'[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees.'" *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (quoting *Mayer*, 309 S.W.3d at 556). Here, "[t]he State . . . concedes that there is no evidence in the record establishing Appellant's ability to pay [his attorney's] fees." Thus, the assessment of $16,450.00 in attorney's fees for counsel appointed to represent McCurdy was erroneous and should be removed from the judgment. *See generally Mayer*, 309 S.W.3d 552; *Roberts v. State*, No. 02-11-00500-CV, 2013 WL 452177, at *2 (Tex. App.—Fort Worth Feb. 7, 2013, no pet.); *Taylor v. State*, No. 02-12-00106-CR, 2013 WL 978842, at *1 (Tex. App.—Fort Worth Mar. 14, 2013, pet. struck) (mem. op., not designated for publication).[4]

---

[4]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

We modify the judgment to delete the award of attorney's fees.[5]  We affirm the judgment, as modified.


Josh R. Morriss, III
Chief Justice

Date Submitted:      September 5, 2013
Date Decided:        September 26, 2013

Do Not Publish

---

[5]The State concedes that "[t]he appropriate remedy is to modify the judgment" and requests that the "judgment be reformed to strike the improper assessment of attorney's fees."

11